Hedi Katz v. Commissioner.
Katz v. Commissioner
Docket No. 40008.
United States Tax Court
1954 Tax Ct. Memo LEXIS 291; 13 T.C.M. (CCH) 188; T.C.M. (RIA) 54064; February 26, 1954
Frank G. Parker, Esq., for the petitioner. James J. Quinn, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency of $260.98 in petitioner's income taxes for the year 1948. Some issues have been conceded by both parties. The sole remaining question is whether petitioner operated a fruit grove located on her residential property as a business or transaction entered into for profit during the year in controversy, so as to permit the deduction of the expenses of its operation under section 23 of the Internal Revenue Code. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is an individual residing at Frank Road, Stony Point, New York. She filed *292 an individual Federal income tax return for the year in controversy with the collector for the fourteenth district of New York. Petitioner has lived in Rockland County since 1933. Prior to 1941, she lived in a rented house. On August 28, 1941, petitioner purchased a farm of 20.9 acres located at Stony Point, Rockland County, New York. The purchase price of the farm was $3,650. Thereafter, petitioner caused a small four-room dwelling to be erected on the farm, utilizing the foundations of a former building long in a state of decay. Petitioner moved into this dwelling on or about June 15, 1942 and has made it her home since that time. The farm was in a completely neglected condition at the time it was purchased by petitioner. It had been for sale for many years. Petitioner was able to purchase the farm for the relatively small amount of $3,650 because of its condition and the lack of competing bidders. Shortly after taking possession of the farm, petitioner embarked upon the development of an orchard. The primary purpose in purchasing the property in 1941 was not merely to find a home to live in, because for that purpose alone, petitioner would have continued to rent a house. The *293 property was bought with the intention of developing an orchard as a business enterprise in view of petitioner's approaching old age and her entire financial situation. Petitioner had planned this orchard for many years prior to buying it with the idea of augmenting her retirement income. Although, prior to purchasing this property, petitioner did not have practical experience with the growing and developing of an orchard, petitioner made a study of the cost of developing and growing the orchard, and of her profit expectations in such a venture. This consisted, in part, in engaging in frequent and long conversations with a well-known fruit grower living at her house, and observing him actually develop a new part of his fruit orchard which was started from rudimentary beginnings. Petitioner read books where cost and investment practices were outlined. Petitioner has a good deal of literature on that subject in her home. Petitioner consulted publications from the Department of Agriculture in Washington, D.C., and from the Agriculture Department of Cornell University, which she received by mail. Petitioner listened to radio comments from the New York State Fruit Station. Personal *294 advice was sought from time to time from Mr. William Clark, Resident Agent for the Department of Agriculture of the United States, with offices at the Courthouse, New City, New York, in the development of this orchard. New trees and berries were purchased from the New York State Agricultural Station at Geneva, New York, and from local nurseries. Selections were made on the basis of quality. Petitioner purchased only the very finest stock she could possibly get. Petitioner's whold plan from the very beginning was not to compete with cheap fruit trees in the market. Because of the small orchard, her goal was not quantity, but quality. The first phase of developing this orchard was the clearing of the land, the removal of rocks and stones therefrom and the cutting down of brush and trees. This operation had to be carried out by hand, with the axe, and could not be done by machine. The task was difficult, time consuming and expensive. Petitioner provided for water by digging a well 104 feet deep. The water was used for the home as well as for the orchard, but a special outlet was installed for the orchard. There are many springs on the land, and because the land is hilly, petitioner *295 dug ditches to prevent erosion of the soil. In her income tax returns for the years 1941 through 1945 inclusive, the petitioner did not claim any deductions for expenses in connection with the orchard. In her income tax returns for the years 1946 through 1952 inclusive, the petitioner claimed deductions on account of the following expenses for the upkeep of the orchard and the cultivation and spraying of trees: 1946
$ 806.00
1947
863.00
1948
939.00
1949
1,312.23
1950
1,370.00
1951
693.43
1952
543.50 No sales whatever of apples or any other products of the orchard were made by petitioner in any of the above years except in 1946 when petitioner made a sale of apples from one tree for the gross price $100of. The sale was effected by allowing the purchasers to come onto her property with their own baskets and pick the apples off the tree themselves. Other than the above-mentioned sale, petitioner would allow her neighbors to come to her property and take as much of the fruit as they wished. That particular tree died of old age shortly thereafter and had to be cut down. The soil on petitioner's property was of poor quality in 1946. Beginning with 1946, petitioner *296 undertook additional operations with the land. The soil was prepared by plowing and fertilized with manure, and this had to be continued over a number of years until any response could be had from the soil. Thereafter, petitioner started planting young trees, adding, on the average, 25 trees every year. Many of the new trees were lost. Some died during the winter and some were stolen. Every year between 5 and 7 trees died for unascertainable reasons. The trees were pruned and sprayed many times each season, and other processes necessary in the development of an orchard were employed, such as regular plowing and harrowing of the ground. In 1946, petitioner had only some 60 unimproved old apple trees on her property, of which eventually about 50 survived, but fruit borne by those old apple trees was of no commercial value. She waited until 1948 before she started to restore these trees, hoping for a commercially valuable crop. The petitioner employed one John Bulson of Stony Point, New York, in general labor on her property in 1948. On two occasions in 1948, she employed one William Bulson of Stony Point to plow and fertilize her land. By 1948, petitioner had planted pear *297 trees as well as added new apple trees. New plum trees were first planted in 1948 and 1949. Other types of trees were added thereafter and at the time of the hearing herein, petitioner had the following types of new trees on her property: Apple, peach, sour cherry, sweet cherry, plum, pear and apricot trees. Petitioner also planted two Chinese nut trees, but these died. Leaflet No. 172 of the United States Department of Agriculture, entitled "Why Fruit Trees Fail to Bear" issued December 1939, slightly revised December 1943, states the following: "(a) The majority of varieties of standard apple trees east of the Rocky Mountains bear crops when the trees are six to eight years old. (The age being reckoned from the time they are planted in the orchard.) "(b) Most varieties of pear trees bear crops when the trees are six to seven years of age. "(c) Peach trees under favorable conditions will bear crops at or about four years of age. "(d) Sour cherry trees will bear crops when the trees are four to five years of age. "(e) Sweet cherry trees will bear crops when the trees are five to seven years of age. "(f) Plum trees (Japanese varieties) will bear crops when the trees are *298 three to five years of age, and "(g) Plum trees (European varieties) will bear crops when the trees are five to six years of age." Petitioner's experience with her new fruit trees is in accord with the facts stated in Leaflet No. 172, United States Department of Agriculture. Beginning in 1948, petitioner started to improve some of the old apple trees she found on her property, by grafting. This was done after a survey had been made by the County Agent, despite his doubts as to the feasibility of the improvement operation. This operation was undertaken on an experimental basis. The earliest time when improvement could be expected was two to three years after the grafting operation. Although petitioner expects returns from the old apple trees, up to the present time, the fruit of these old trees has been bad in quality and especially in taste. In view of the bad quality and bad taste of the fruit during the year in controversy, it would not have been worth while to invest in advertising and pay for labor to take the fruit down and buy the necessary materials for the few bushels involved. Under the circumstances, the overhead would have been more than the possible receipts. *299 Petitioner did not use any of these apples herself. They were used by a neighbor for feeding swine. Not all of the old apple trees which were on petitioner's property at the time of purchase survived. A number of trees were lost every year. Some became victims of a hurricane and lightning struck a number of them; others were lost from other causes. During 1953, three old trees were cut down which proved to be entirely diseased inside when cut down. Despite the loss of old trees and new trees, there was a steady increase in the total number of trees, so that at the time of the hearing, petitioner had about 150 fruit trees, consisting of about 50 old apple trees and about 100 new fruit trees. Petitioner also planted berries on her property. It takes a number of years to develop berries. In 1949, petitioner planted her first batch of strawberries on an experimental basis. The first crop of strawberries (1951) was plowed under because the quality was not yet good enough for commercial purposes. Strawberry plants bear fruit every second year and must then be planted again. The strawberries appear to be improving. In 1949 and 1950, petitioner for the first time planted boysenberries, *300 blueberries, gooseberries, and raspberries; thereafter petitioner added white and red currants. Four rows of rare grapes were first planted in 1949. None of these berries had reached commercial quality before 1953. The grapes first bore fruit in 1952 but developed a disease called "Black Rot." For these reasons none of the fruit could be sold. From time to time petitioner was assisted by several people who helped with the weeding. The expenses of $939 herein involved were expended for the labor of John Bulson and William Bulson, plus the labor of persons helping with weeding and for tool sharpening, for the cost of manure and for cultivating and spraying materials. None of these men were paid to do work outside the orchard; and none of these men did work in the house. The men were not employed to do repair or painting jobs in or on the house, or to mow the lawn. Nor did these men work on other parts of the farm, no other part of the farm being under cultivation. Petitioner devotes several hours each day to the orchard. When she returns from her job at the RCA Communications, Inc. in the morning, she outlines to her helpers the work to be done which varies with the seasons, *301 and supervises it. When the helpers are ready to leave, petitioner inspects the work that has been done. Petitioner also spends time on the orchard over week-ends. Petitioner's labor costs, when work on the orchard was first undertaken, were 50 cents an hour, with a minimum of $4.25 a day. In 1948 her labor costs rose to 70 cents per hour with a minimum of $5.00 a day. Her labor costs thereafter advanced to $1.00 an hour and are presently $1.50 an hour. Expenses for materials also increased during that same period. Petitioner does not preserve fruit since she does not have the time. She lives alone and will use very few bushels of the fruit she grows around the household. She is not allowed to eat any fruit herself because of its acid content. Petitioner expects to derive a profit from the sale of fruit beginning with the year ending December 31, 1953. A possible market exists for this fruit. There are two highways in the vicinity of the land, frequented by many people. There is a Boy Scout camp located on 330 acres of land opposite petitioner's farm. This Boy Scout camp was first developed seven years ago and started operations in 1949. Petitioner expects to sell fruit to the *302 Boy Scout camp nearby since every two weeks the parents of the Boy Scouts come to visit them. Petitioner also expects to sell fruit to people traveling the nearby new highways. Petitioner further expects to sell fruit by advertising. The Boy Scout camp located next to petitioner's property never existed as a camp until the year 1949. Although petitioner did not keep separate books for the farm in 1948, she made almost all her payments by check and made entries in her checkbook so that she could at any time determine what her expenses were in 1948. Petitioner now keeps separate books for her farm expenses. At the time of the hearing herein petitioner was a woman of 63 years of age and in poor health. Petitioner is primarily a musician. By the terms of the Pension Plan of the RCA Communications, Inc., petitioner is required to retire at the age of 65, in 1955, which requirement can be waived only by special year-to-year approval of the Board of Directors. Petitioner does not expect that at the age of 65 she can continue to work at RCA Communications, Inc., or elsewhere, because of her physical condition. At the age of 65 petitioner expects a retirement income based on social *303 security and the RCA Communications, Inc. retirement plan, totaling about $100 monthly. Although in 1948 petitioner received $50 a month from her husband, which was later increased to $90 a month, these payments were not made pursuant to court decree or other judicially enforceable agreement and were a completely voluntary undertaking on his part. These payments will be discontinued after 1953, petitioner's husband, a professor at Hampton Institute at Hampton, Virginia, having reached the age of 65 in December 1952 and expecting to retire in 1953. Petitioner still has an outstanding mortgage of $1,457 on her property; this is being paid up at the rate of $42 a month. After her retirement petitioner expects to have no income except the $100 a month from social security and retirement benefits, referred to above, and from the orchard. Petitioner operated the fruit grove located on her property during the year in controversy as a business or investment entered into for profit or for the production of income. Opinion This is not the typical "gentleman's farm loss" case for several reasons. The expenses incurred were restricted to the care of petitioner's orchard. They could *304 have had no connection with the remainder of the property or with her dwelling. See Hamilton F. Kean, 10 B.T.A. 97; cf. Estate of Mortimer B. Fuller, 9 T.C. 1069, 1076, affd. (C.A. 3) 171 Fed. (2d) 704, certiorari denied 336 U.S. 961. Petitioner is shown to be a person of modest means for whom the expenses in question would have been extravagant had they not been designed as an investment. Cf. Thacher v. Lowe, ( S.D.,N.Y.) 288 Fed. 994. And a rational explanation is advanced as to why no income has yet been collected. Norton L. Smith, 9 T.C. 1150; Israel O. Blake, 38 B.T.A. 1457. Finally, the items claimed are recognized by respondent as of an operating character and not capital in nature, at least unless the taxpayer so elects. Mim. 6030, 1946-2 C.B. 45, 46. [1]
*305 It may be that if losses continue indefinitely, petitioner's testimony in some future proceeding may not carry its present conviction. But that is not a ground for rejecting her claim on this record. The deduction in controversy should have been allowed. Decision will be entered under Rule 50. Footnotes
1. Expenditures incurred during the development period which represent ordinary and necessary expense items as an incident of current operations, such as the upkeep of a grove or orchard, taxes, water for irrigation purposes, and cultivating and spraying of trees may, under the provisions of section 29.23(a)-11 of Regulations 111, be either capitalized or deducted at the election of the taxpayer. (Mim. 6030, supra.)↩